We have four cases to be submitted today on oral argument. We'll hear the first two and then take a brief recess before hearing the final two cases. We begin today with United States v. Bazemore. Mr. Page. How many arguments is this for you, Mr. Page? Probably pushing 60. Okay. May it please the Court, the district court in this case found $1.7 million in actual loss to an entity called Portagon in this case, but the true number of actual loss to that entity should have been zero. Portagon in this case issued loans to fund the purchase of life insurance policies and in the process took a security interest in those policies. But after the fraud was disclosed, and it might be worth reiterating again that it was a — not a fraud that affected the age or health status of the insured, so it doesn't directly affect the likelihood that the insured would pass away before the premiums were collected or vice versa. But after the — it was a fraud. A jury did find it was a fraud. And it affected whether they would have issued the policies. It did. And a jury has found that that is fraud. It was material in that. It was material. So we're beyond questioning the conviction here. But after the fraud was disclosed, Portagon turned around and sold its loans and the associated interest in the policies to an entity that I will call EA for lack of German language skills. In this sale, Portagon recouped every penny of its loan. And so because Portagon has lost no money and EA was not defrauded because it bought the policies after the fraud was disclosed, $1.7 million is not the correct measure of actual loss. From what I saw on the record, it doesn't seem like there's a lot of detail about the subsequent sales of the Portagon loans. Who bears the burden of proof on what happened to the loans? Because it seems to me you're arguing for an offset against loss amounts. So who bears the burden of proof on that? The government does for three reasons. The first reason is that it is loss. And loss is an offset. I mean, loss is an adjustment to the base offense level. It's clear under this Court's precedent that adjustments to the base offense level are borne, that burden is borne by the government or by the proponent of the adjustment. The second reason is if you look in the note about collateral, you look in Roman numeral 3 in the note about collateral. It says there's a presumption that certain assessments can be used to value collateral. And that shows at least that the Sentencing Commission knows how to create a presumption in the valuation of collateral when it wants to do so. And there is no indication in the text of the note that says collateral offsets the value of loss in this case. Collateral offsets the value of loss that they intended to qualify the general burden of proof or create a presumption that there is no value to collateral until the defendant shows that there is some. The third reason that the government ought to bear the burden of proof is I think we can take some guidance from Goss, which is a case cited by the district court and cited again by mention in the briefs again, in which this court had to decide whether the defendant really had an intent to repay a loan in order to decide whether it would take into consideration collateral at all. And when it did so, it said there is basically a silent record about this. There's no evidence that he intended to repay the loan. There's no evidence that he didn't. That's a different question about collateral than we have here. But that silent record in Goss was resolved against the government, and the case was ultimately remanded to the district court. So that shows that there isn't a general burden shift when we begin dealing with the question of offsets in collateral. And I would submit you could think of it as an offset, but you could just as easily think of it as a question of whether or not Portagon was harmed at all or whether EA was — there was proximate cause for the secondary purchaser in this case. So in those cases, you don't have to — it's sort of arbitrary whether we consider the question as involving collateral, which is an offset to loss, or the absence of loss in the first place. So I don't think there's anything that shifts the burden of proof. Do you agree the record isn't very clear as to what happened to this loan portfolio? It's not very — no, it isn't. It's not — it's pretty scarce on this case. The most probative facts in the record, though, bend in favor of the defendant. And the most probative fact in that is that if we look at page 718 of the record, it does say that EA, the secondary purchaser, continued to make payments on at least some of the policies. So that's pretty significant for several reasons. It shows that the policies, when they were transferred, had some economic value. The government in this case, relying on the fact that the 302 names — it says that this was an EU-mandated windup, suggests that this was not an arm's-length transaction, that maybe it was something like a bailout of a corporation that — or a financial institution that had made some bad loans. But if that were so, then I don't think that we would expect to see — if they weren't buying it for value, we wouldn't expect them to see them continuing to back the policies, the security interests they've bought, with additional money after that had happened. If it was just there to clear the books, then we wouldn't expect them to continue to invest in them. So I acknowledge that this is a rare case — that it probably is a rare case where the victim's compensation reduces loss. And so I want to distinguish this from two other situations that are probably more common, where a victim's compensation would not reduce loss. One of these is where an asset is fraudulently acquired, and then it is sold by the victim to a secondary purchaser before the fraud is discovered. In that case, the secondary purchaser really does stand in the shoes of the first purchaser. Economically speaking, they are as defrauded as the original victim was. So if you imagine a mortgage fraud case where the defendant gets a loan for a house, and it's an asset, and it's wildly overvalued, the collateral is wildly overvalued, and then the bank sells that to a secondary purchaser down the line. If that all happens before the fraud is disclosed, then whoever buys the house the second time is as defrauded as the first one. But here, on page 718 of the record again, the Government's 302 says that the secondary purchase occurred in January of 2015 while Mr. Bazemore was sitting in a federal prison. So this is not a case where EA was defrauded by Mr. Bazemore. The fraud is already out there for them to see. Given the complexity and uncertainty that I think you've highlighted surrounding the loss calculation, isn't this precisely the type of case in which gain should be the basis for the sentencing guidelines? In other words, looking at your client's commissions because loss is not readily calculable? Well, the first most obvious reason that it is not the case for that is that the court ruled that gain shall not be the measure of loss in the first sentencing hearing. So if we have nothing else to say about law of the case in this case, then at the very minimum we can't undo that. But he found that because he said there was this big, huge loss amount that he thought he correctly calculated. We then said it was wrong, and the guideline says you use gain if loss cannot be reasonably ascertained. And so since we've now told him, at least in the first appeal, loss cannot be reasonably ascertained or you didn't correctly determine loss, it seems to me if we find that again, that you're wrong about loss, aren't we getting to a point where it's saying loss just can't be figured out? Well, there's a difference between saying this record doesn't show whether or not the loss can't be ascertained on this record and it can't be ascertained at all. It could be ascertained. We could look at Portagon's tax returns and see how did they value these assets later. We could look at the details of this transaction and say, was there a specific itemized price for these particular loans in this case? The mere fact that the record is not well developed doesn't mean that it's impossible to show what the loss is in this case. And as far as law of the case goes, I would submit that this situation is basically just like Haas. There was something else that determined the sentence that made it sort of gave us a lot less incentive to appeal. Both sides had less incentive to appeal the ruling that gain could not be the measure of loss in this case. But as in Haas, the fact that something else was more salient in the first appeal doesn't absolve the parties of the duty to appeal the findings that were made that don't affect them. So the other point I want to make about the part of the record that the government relies on, here's the part of the record that they say shows that this was not an arm's-length transaction and that it was part of a larger portfolio. It says, as part of the wind-down measures mandated by the European Union, Portagon, formerly known as West LB, transferred its loan and securities portfolios to EAA. In May 2010, the loan made to PF Participation Trust was transferred to EAA. That part of the record, first of all, doesn't say that this was not an arm's-length transaction. It says that, in a way, Portagon was required to make this transaction. But all the record shows, it doesn't even show that EAA is a public entity. And it certainly doesn't say that they weren't profit-motivated or that they weren't motivated to get a good deal in this transaction. So the part of the record that the government relies on certainly doesn't carry its burden, and it doesn't stand up to the more probative evidence that EAA is continuing to make payments on the policy. So they must expect that there is some likelihood that they could receive money back that they're contributing to. With the time left, I want to discuss, if I may, if the Court will indulge, the proffer agreement and why I think the proffer agreement should defeat a finding of actual loss in this case. Isn't there an issue about whether you've waived that by not raising it in the first appeal? There sure is. And this is the — what I'm submitting about the proffer agreement is that it is a finding against the — excuse me, that it is a — it's an attack on a finding of actual loss. And there was no finding of actual loss in the first appeal. So it would — there was no — we could have raised a similar attack on the finding of intended loss in the first appeal, but the defendant is not required, the parties are not required to raise all issues that are similar to ones that they might want to raise in a second appeal or on remand. This is an attack on a finding of actual loss, which was not made in the first hearing. There is a dispute about whether or not there was an affirmative finding of zero loss, but there certainly was not a finding that the defendant caused actual loss under the guidelines in the first appeal. So at a minimum, this arises from the remand, the issues in the remand. The one point — the one point I want to offer the Court about the proffer agreement is that there is a derivative use exception in the proffer agreement, but the reason that this does not fall within that is that the government was using and the Court was using to calculate his actual loss the very same misconduct that the defendant confessed in the proffer agreement. But not his statement, and they knew about it even before, so I don't think it's even one of the better cases for arguing there's a violation of that. How do you get around the fact that the agreement says the government can pursue investigative leads based on what the person being questioned says? If that part of the — well, there's two ways. One way is that the agreement says it shall not directly use his statement or any information, right? So the evidentiary use of his statement at sentencing, at a trial, that would be the use of his statement. But when it says it also shall not use the information, directly use the information against him, that I submit means it cannot use the misconduct he confessed in that proceeding. That standard language in all of these proffer agreements, as you well know, you would basically be giving blanket immunity. I mean, someone comes in and says, I committed 20 murders, and the government in your view couldn't follow up and look back at those murder files and test DNA and do all that stuff? I mean, isn't that the logical conclusion of your position? The murders would be covered by the violent crime exception to that, but — But absolutely not. But that is. And we want defendants to come in and provide honest information about what they've done. We don't want them to be dishonest. And if they are incomplete about their confession, then the government can take a that they've said in there and then go and prove the rest of the case. But it doesn't allow them to merely confirm what he said in some other means. Thank you very much. You've saved time for rebuttal, Mr. Page. Mr. Falconer. Thank you. Good morning, and may it please the Court. Emily Falconer for the United States. I'd like to begin by saying that Section 2B1.1 of the guideline, the actual loss guideline, requires only that the district court make a reasonable estimation, a reasonable estimate of the loss attributable to the offense. Now, in the case of these Portagon losses, the district court's estimate of the losses was more than reasonable — was more than reasonable. Excuse me. I lost my train of thought. But anyway, it is required to make a reasonable estimate as to the losses. Now, here, these losses were, you know, we believe entirely correct. But even if there is some uncertainty, as Judge Costa mentioned, in the record in determining exactly what those losses were, we have to remember that the guideline requires only a reasonable estimate based on the evidence. Additionally, this Court said in the Goss case, which Mr. Page discussed moments ago, that sometimes in a case like this, where you have a type of fraud that results in some secondary losses to lenders, oftentimes it's difficult, if not impossible, to determine the exact amount of loss to those lenders. Now, that's actually not the case here. Here, there are two documents in the record that very clearly speak to the Portagon losses. Those are the FBI 302 forms. One is on page 715 of the record. That's from the initial sentencing. The other is on page 717 of the record. That is from the second sentencing. Now, what the first 302 form says is that Portagon, the entity that lost money on three categories of loans by lending the premiums to fund these fraudulent loans applied for by Mr. Raysmore. Now, that fact is undisputed here. It was undisputed at the first sentencing. It was undisputed on the first appeal. That amount was included in the restitution award in the first appeal and has never up to this point been disputed, even on this appeal, that Portagon suffered a loss. Now, the question is, what do we do with the fact that Portagon subsequently transferred its loans and securities, all of it, according to page 717 of the record, all of its loans and securities to another entity called EAA? Now, there's two ways to look at that question. One is if you look at that second 302 form on page 719 of the record, it explicitly says that that loss to Portagon transferred down to EAA, that EAA simply stepped into the shoes of Portagon with respect to that loss. Now, that, in our opinion, is the easiest way to resolve this case is to say that the record clearly states that those losses to Portagon were passed down to EAA, not really important the series of transfers that happened between special purpose entities and for what reason. There was a loss to Portagon, and at the time of the second sentencing, there was a loss to EAA. Now, the district court was of the opinion that the loss should – we shouldn't look at the EAA transfer at all and that the loss should be assessed at the time of the first sentencing, in which case it would just be a matter of taking the losses to Portagon and then subtracting the value of the collateral. Now, Mr. Page discusses at length the value of the collateral, but I would point out that from that first 302, the three categories of loans that were secured by insurance policies, the collateral is insurance policies that have terminated, lapsed, or been closed. So common sense would tell us that the value of that collateral is zero. I don't know how a lapsed insurance policy or closed insurance policy can have collateral value at all. So if we look at that initial sentencing, there's nothing to subtract. A closed policy, a policy that's been rescinded by the insurance company, has no value as a collateral. No one's ever going to collect on those policies. They've been closed. The policies that are still active, that can be collected upon, those have not been included in the loss amount, neither loss amount nor restitution. So there's kind of two ways to look at it. Either look at the time of the initial sentencing and say the 302 form says that there was a loss to Portagon and realistically we can say that a closed insurance policy has no value, or we can look at the second sentencing, look at that 302 form and say there was that loss, whatever loss to Portagon passed down to EAA. Now, I would point out, too, the standard of review on this issue certainly would be the method of calculating loss would be de novo. But all of these questions about what happened, who suffered a loss, when, these are all factual determinations that are subject to review for clear error. So to the extent the district court determined that EAA did suffer a loss, did step into the shoes of Portagon, or that Portagon suffered a loss and we look at the first sentencing, those are factual determinations that are subject to review for clear error. And it cannot be said, looking closely at those 302 forms, that those findings are not plausible in light of the record as a whole. The 302 forms were presented to the judge at sentencing? They were in the sentencing record, yes. They were, Judge O'Connor did, he requested in addition to the objections to the PSR, supplemental briefing from both parties on this loss amount. It was briefed at great length. The government's briefing relied heavily on these two 302 forms and they were also attached to the government's brief. So yes, they were certainly in front of the district court at the time of the initial sentencing. I would point out too, the Portagon losses, we've made a number of arguments with respect to what ought to have been raised on the first appeal. The Portagon losses are certainly one of them. Now, there is a difference between what an actual loss amount does under the guidelines and what restitution does, but the bottom line is that this $1.7 million figure was at play in the first sentencing, it was included in the restitution award, it was never mentioned, it was never challenged, it was never raised to the district court until now. So there's certainly a waiver that has gone on there. Additionally, and I think the strongest case for waiver is, as mentioned during Mr. Page's argument, the proffer agreement. Now, that is one that was actually raised at the first sentencing. He did argue at the first sentencing that none of these Portagon losses could be included because of the proffer session. Now, he raised that at the first sentencing. He actually raised it in his securities fraud case post-conviction, tried to get his conviction overturned in that case because the government used that in the sentencing here. So he was shopping that argument all around at the time of the first sentencing, consciously chose to abandon that argument on the first appeal, did not raise it at all, and now is essentially, as Judge Costa mentioned, asking for blanket immunity for mentioning this subsequent crime in that proffer session. But if the court is inclined to delve into that issue, the issue of the proffer, the derivative use clause in the proffer agreement is extremely broad. It allows the government to use, make derivative use of any statements or information provided to pursue, quote, any investigative lead. And the agreement, and there's some case law, specific case law, that talks about the Kett case is one that we cite in our brief, that construes such provisions extremely broadly. Now, our agreement went a step further and said, we have a broad derivative use agreement here, and the purpose of that is so that we don't later have to litigate the issue of whether our whole investigation was tainted by you having revealed, you know, whatever you reveal in this session. We didn't even know at the time that he was going to come and reveal a subsequent crime. But certainly that makes this an extremely broad agreement, and there's nothing about that that would bar us from using information there. Additionally, the government isn't even directly, as the argument that he's making, is that the government simply took information from the proffer session and corroborated it, and that that's not acceptable. Now, we argue that under this court's case law it is. That's not what happened here. Again, we have another 302 form in the record that details what he said in that interview. This is on page 508 of the record. The only information that he revealed in that proffer session that's relevant to the Portagon losses is that he used, quote, banks and hedge funds to fund the scheme. He didn't say anything about Portagon. There was nothing about any specific entities. So the argument he appears to be making here is that none of the – he's basically, by mentioning banks and hedge funds in that session, has basically insulated any financial institution involved in the scheme from being included in the loss calculation, and that's just not a reasonable reading, in our opinion, of the proffer agreement or this court's case law. But one other thing that we would mention with respect to the loss amount, Judge Costa mentioned that this is a case where it's extremely difficult to determine the loss amount. If the court were to say that it were appropriate to use gain, Bayes-Morth gain, because it's just too hard to figure out exactly what happened here, we don't think that's necessary. But if it did, that would put him back in the same position he was in at the initial sentencing. He gained $4 million in commissions behind this scheme. Now, here he's been sentenced based on $2.7 million in losses, so that bumped him down a couple levels, and his sentence was reduced by almost 10 years between the first and the second sentencing. So that would not be a favorable outcome for him. The government's happy with the current calculation. They don't think we need to remand and have him reason it's based on gain, although that would only result in a more harsh result for him. You argue that any guideline error is harmless, and the other side says, well, Judge O'Connor sentenced him at the top of the guideline to this 188 months, which is an odd number to just pick out of thin air. It must have been based on the guideline itself. How do you respond to that? So this relates to the Martinez-Romero case that Mr. Bayes-Morth cites in his reply brief. And he construes that case in his brief extremely broadly to mean that if you pick, if the judge picks a sentence on either end of the guideline range, either high-end or low-end sentence, that that cannot be harmless error because it was on the brackets of the guidelines. Now, Martinez-Romero says no such thing. The Court did refer to the fact that he had a low-end sentence. But the thing that really distinguishes that case from this one is that what the Court did in Martinez-Romero was to say, I believe, regardless of any of my rulings on any of these objections, that a sentence within this range, X to Y, I don't remember exactly what the numbers were in that case, but within this range I would pick in any event something within this range. And this Court said it's just you can't say that it's a coincidence that you would sentence within this range and it wasn't tied to the guidelines. Now, he didn't say anything about picking a number within a guideline. And to construe it that way, to say that picking any sentence within the proper guideline range can't be harmless error would essentially vitiate the entire doctrine of harmless error in this Court's case law, which is well established, that the government can prove harmless error if it can prove that the district court would have assigned the same sentence for the same reason and absent reliance on the guidelines. Now, we've shown all those things here. The district judge in this case said that he would assign the same sentence, which was the high end of the guideline range, 188 months, but he said he would assign that same sentence regardless of the loss amount and for the same reasons. And the reasons he gave had nothing to do with the loss amount. In fact, what he said was the reason I would assign the same sentence is because he committed securities fraud crime. While he's on pretrial release for this fraud crime, he commits this insurance fraud crime because of the nature of these two offenses in the proximity in time to each other. The need for deterrence and to protect the public from his ongoing fraudulent schemes is so great that I would assign the sentence in any event. Now, one thing Mr. Bazemore points out in his reply brief is how can it be the case that he would have assigned 188 months in any event when he said at the first sentencing that he would assign 292 months in any event. And that's a fair point, but there's a difference. And I think what happened is that the district court listened on remand to what this court said in Bazemore 1. In Bazemore 1, the first sentencing, the judge said he would assign the same sentence in any event because of the scale of the fraud, i.e., the loss amount. He said this was this $81 million intended loss. I would assign the same sentence in any event. And the Bazemore 1 panel said you're clearly, by saying this massive fraud, you're clearly tying it to your guidelines calculation. That doesn't work. So remanded. And on remand, the court said I will assign this sentence. I would assign it in any event due to the nature of the crime, its proximity in time to a similar crime. It has nothing to do with the guidelines calculation. So that's why it really was not inconsistent for the district court to say 188 months, this is what I would do in any event, and say in the previous sentencing, 292, this is what I would do in any event. I mean, it was listening to the guidance from this court and working on writing a sentence. So we are of the opinion that this is a very strong case for harmless error. This is a case where not only is the loss amount difficult to determine, but the $2.7 million actual loss in many ways understates the culpability of his conduct. And I think that's something the court was looking at, too. I mean, perhaps he didn't secure all the policies applied for. He applied for $450 million in fraudulent insurance policies. He recruited senior citizens as straw buyers, made false representations to them about a payout they would receive, and he jeopardized their financial stake, their potential eligibility for government benefits. He falsified reports from true professionals. He actually took real CPAs' names out of the yellow pages and falsified reports in their names. So there were many victims of this crime who have no losses to be counted in the loss amount. So there's a strong argument that the district court is making that this sentence was needed to protect the public from this fraud. And so that would be a very direct way for the court to resolve this case. One other point I'd like to touch on before I conclude is the question about who has the burden of proof on the offset issue. This is kind of going back to the offset issue. It's one thing I wanted to circle back to. Generally speaking, the defendant has a burden to prove an offset from a loss amount or restitution award. The government proves the amount of loss to Portagon. If the defendant feels he's entitled to an offset, that's something that the defendant would bear the burden to prove. But in this case, even if the government had the burden of proof, we feel that burden of proof was discharged with these 302 forms. I would really encourage the court to go and look, especially at page 719 of the second one, which says that EAA simply stepped right into Portagon's shoes with respect to these losses. And that was certainly enough evidence for the district court to plausibly determine that this loss, that EAA did step for a loss and was includable in the loss amount. So if the court has no other questions, thank you. Thank you, Ms. Hawkins. Thank you. Mr. Page. Let's wait just a minute so I can. Of course. The guidelines do say that it's only necessary to provide a reasonable estimate of the loss. But it is not reasonable to ignore the fact that the victim was completely repaid by a second buyer. And it is not a reasonable way to estimate the value of the security interests in the life insurance policies by ignoring the fact that EAA is continuing to pay money on some of them even after their purchase. What the district court has done is essentially to ignore entirely the secondary payment. The method used by the district court was basically, as I understand the sentencing transcript, to say GOSS forbids me to consider events that occurred after the first resentencing entirely. And so this is not merely a case of a factual finding which might be right or wrong but is sort of in the ballpark and we can say it's not clearly erroneous. This is a case where the district court's reading of GOSS caused it to blind itself to facts that occurred afterwards which shed enormous information about the value of the collateral provided to the first victim and probably zero out the loss entirely. But GOSS does say to use the market value at time of sentencing. That's a pretty plain statement. Not hard to deal with, is it? Well, the subsequent payment of that, of the subsequent disposition of that collateral sheds more information about what the value was at the time of the first sentencing. Right? GOSS doesn't say ignore all facts that occurred afterwards. It says the ultimate issue you're looking for is what was the value of the collateral at the first sentencing. It doesn't say, it doesn't close the record, it doesn't close the evidentiary record on that question if there's much more probative evidence that occurs. And GOSS is also saying, is also about a case where there is undisposed collateral, right, where the victim in that case has the, has houses. They haven't resold them. And so in 2008 it's the financial crisis. They might go up. They probably go down. What is the value of those houses at the time? So we can distinguish GOSS from a case like this one where we're not looking at just what the value was when Portagon had it, but it's a completely different case where Portagon disposed of the collateral and sold it. The Guideline treats those two questions separately. It says don't look at the value of the collateral at the time of sentencing if it has been disposed of. That's what's in Note 3 there. Furthermore, I would say that if on the scarce record there is the burden of proof, the court believes the burden of proof lies with the defendant to show an offset, I would submit that the defendant carried that burden at least by a preponderance of the evidence by showing, first of all, that the collateral was not disposed of. It continues to make payments on the active policies that are happening right now. It is not — But on the proffer agreement, going back to that, give me an example in your client's situation, Mr. Bazemore, of an investigative lead the government could have pursued as contemplated by the agreement in response to what he said. If the defendant said, I know a man named — named a co-conspirator in that case, but didn't tell him I've been engaging in insurance fraud or describe — outline that scheme, then in that situation they could use something that he said to prove misconduct that he didn't tell them about. But — but if the agreement says statement or information, then the — or information part must mean, if it's to have any benefit to the defendant at all, or information must mean — The benefit is he gets — you typically do those agreements to get cooperation. It's a huge benefit, which we know is the real way in the Federal system to reduce your sentence is to get cooperation. That's why people do it. Wouldn't there still be a full incentive to go and cooperate and get your sentence reduced? Well, there wouldn't be any incentive to be in a proffer agreement. There might be an incentive to cooperate. But if we're looking at a contract and we're saying a contract has a real benefit from both sides, the defendant can walk in and cooperate and hope to get a 5K. But he doesn't get any assurance that he's going to get a 5K for doing that. What the proffer agreement does is say both parties are going to get something out of this. So with that, it appears no matter. Thank you, Mr. Page. Your case is under submission.